IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

MICHAEL KIMBLE,                                    }
TDCJ-CID NO.678034,                                }
        Plaintiff,                               }
v.                                                 }          CIVIL ACTION NO. G-05-310
                                                   }
WARDEN D. KUKUA, *et al.*,                         }
        Defendants.                              }


OPINION ON DISMISSAL


Plaintiff is a chronic care state inmate who suffers from joint disease in his knees and ankles, Hepatitis C, a heart condition and high blood pressure. (Docket Entries No.14, No.15). Proceeding *pro se* and *in forma pauperis*, plaintiff has filed a complaint pursuant to 42 U.S.C. § 1983 and memorandum in support of the complaint against defendants Warden D. Kukua, CO Olunatobi A. Oso, and CO Loise L. Taylor. (Docket Entries No.1, No.2). Plaintiff has also filed answers to interrogatories regarding these defendants. (Docket Entry No.19). On September 9, 2005, plaintiff filed an amended complaint and a memorandum in support of the complaint, alleging claims against Wardens Kenneth Negbenebor and Samuel Seale, Unit Case Manager Charles Dickerson, Medical Personnel Todd Barton and Sandra Smock, and Lt. Thomas Day. (Docket Entries No.14, No.15). The Court granted plaintiff's motion to amend on June 16, 2006. (Docket Entry No.20). Plaintiff has also filed a more definite statement of his claims. (Docket Entry No.26).

Plaintiff indicates in his amended pleading (Docket Entry No.14) that his claims against defendants Kukua, Oso, and Taylor are pending and states in his Answer to Interrogatories (Docket Entry No.19) that he attached grievances in support of his claims against

these defendants. Although he did not incorporate his claims against these defendants in the amended complaint, the Court finds that he intended to do so; therefore, the Court will address plaintiff's claims against all defendants and dismiss the complaint pursuant to 28 U.S.C. § 1915(e)(2)(B).

## II. STANDARD OF REVIEW

When a litigant proceeds *in forma pauperis*, the district court may scrutinize the basis of the complaint and, if appropriate, dismiss the case without service of process if the claim is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 42 U.S.C. § 1997(e)(c) and 28 U.S.C. § 1915(e)(2)(B). An action is frivolous if it lacks any arguable basis in law or fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998). "A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges violation of a legal interest which clearly does not exist." *Harris v. Hegmann*, 198 F.3d 153, 156 (5th Cir. 1999) (citing *Harper v. Showers*, 174 F.3d 716, 718 (5th Cir. 1999) (quoting *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998)). A review for failure to state a claim is governed by the same standard used to review a dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Newsome v. EEOC*, 301 F.3d 227, 231 (5th Cir. 2002).

Rule 12(b)(6) authorizes a dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bell Atlantic Corp. v.*

*Twombly,* 127 S.Ct. 1955, 1974 (2007).  A court must not dismiss a complaint for failure to state

a claim unless the plaintiff has failed to plead "enough facts to state a claim to relief that is

plausible on its face."  *Twombly,* 127 S.Ct. at 1974; *Erickson v. Pardus,* 127 S.Ct. 2197, 2200

(2007).  Although material allegations in the complaint must be accepted as true and construed in

the light most favorable to the nonmoving party, a court is not required to accept conclusory

legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be

drawn from the factual allegations.  *Twombly*, 127 S.Ct. at 1964-65 (noting that "[f]actual

allegations must be enough to raise a right to relief above the speculative level).

### III. DISCUSSION

The Civil Rights Act of 1866 creates a private right of action for redressing the

violation of federal law by those acting under color of state law.  42 U.S.C. § 1983; *Migra*

*v.Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82 (1984).  Section 1983 is not itself a source

of substantive rights but merely provides a method for vindicating federal rights conferred

elsewhere. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  To prevail on a section 1983 claim, the

plaintiff must prove that a person acting under the color of state law deprived him of a right

secured by the Constitution or laws of the United States. *Blessing v. Freestone*, 520 U.S. 329,

340 (1997).  A section 1983 complainant must support his claim with specific facts

demonstrating a constitutional deprivation and may not simply rely on conclusory allegations.

*Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995).  Thus for plaintiff to recover, he must

show that the defendants deprived him a right guaranteed by the Constitution or the laws of the

United States.  *See Daniels v. Williams*, 474 U.S. 327, 329-31 (1986).  Plaintiff must also prove

that the alleged constitutional or statutory deprivation was intentional or due to deliberate

indifference–not the result of mere negligence. *See Farmer v. Brennan*, 511 U.S. 825, 828-29 (1994). The negligent deprivation of life, liberty, or property is not a constitutional violation. *Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995). Moreover, to hold a defendant liable under section 1983, plaintiff must adduce facts demonstrating the defendant's participation in the alleged wrong. *See Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992).

### A. Defendants Oso, Taylor, and Kukua

Plaintiff claims on December 16, 2004, he informed Correctional Officers Oso and Taylor that he had been issued an administrative pass to have his blood pressure checked. (Docket Entry No.1). Oso and Taylor refused to allow plaintiff to go to the infirmary for the testing and refused to call the infirmary to verify the appointment. (*Id.*). Plaintiff claims he told the officers that he felt faint and dizzy but they denied him access to medical care. (*Id*.). Plaintiff grieved the incident and Warden Kukua denied relief on grounds that plaintiff did not present the pass to the officers and did not tell them that he was feeling ill. (*Id.*). In response to his Step 2 Grievance complaining of the same, Assistant Regional Director J.P. Guyton noted, "[a]fter further investigation corrective action was taken. Medical Passes will be honored. Grievance resolved." (*Id*.).

Plaintiff seeks declaratory and injunctive relief and compensatory and punitive damages on grounds that defendants Oso and Taylor acted with deliberate indifference to his serious medical needs by obstructing his access to medical care. (Docket Entries No.1, No.3). He further contends that Warden Kukua maintained policies that interfered with adequate medical care. (Docket Entry No.19).

The Eighth Amendment's prohibition against cruel and unusual punishment forbids deliberate indifference to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The plaintiff must prove objectively that he was exposed to a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. The plaintiff must also show that prison officials acted or failed to act with deliberate indifference to that risk. *Id.* at 834. The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the prison officials were actually aware of the risk, yet consciously disregarded it. *Id.* at 837, 839; *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002). "[F]acts underlying a claim of 'deliberate indifference' must clearly evince the medical need in question and the alleged official dereliction." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). "The legal conclusion of 'deliberate indifference,' therefore, must rest on facts clearly evincing 'wanton' actions on the part of the defendants." *Id.*

Deliberate indifference to serious medical needs may be manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Estelle*, 429 U.S. at 104-05. Delay in obtaining medical treatment does not constitute deliberate indifference unless it is shown that the delay resulted in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

In this case, plaintiff's pleadings do not show that he suffered substantial harm as a result of Officers Oso and Taylor's refusal to honor his medical pass to have his blood pressure checked. His pleadings further fail to show that Warden Kukua participated in the alleged constitutional violation or that he initiated or pursued policies that would violate plaintiff's right

to medical care by denying plaintiff's grievance.  *See Mouille v. City of Life Oak, Tex.*, 977 F.2d

924, 929 (5th Cir. 1992) (supervisory officials liable only if affirmatively participate in acts that

cause constitutional violations or implement unconstitutional policies that causally result in

plaintiff's injuries).

Plaintiff's factual allegations are insufficient to show that defendants violated a

legal interest and insufficient to raise a right to relief above the speculative level.  *See Twombly*,

127 S.Ct. at 1965.  Accordingly, his claims against defendants Oso, Taylor, and Kukua are

subject to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B).

B. Defendants Negbenebor, Seale, Dickerson, Day, Bouton, and Smock

In his amended pleadings, plaintiff claims that defendants Wardens Negbenebor

and Seale, Classification Chief Dickerson, Field Officer Lt. Day, PA Bouton, and Nurse Smock,

acted with deliberate indifference to his serious medical needs by forcing him to perform

strenuous work tasks that were beyond his physical capabilities.  (Docket Entry No.26).  He

further complains that Negbenebor, Seale, Dickerson, Bouton, and Smock violated his rights by

failing to take corrective measures, such as modifying his medical restrictions and changing his

job assignment, even after he informed them by sick call requests, grievances, and administrative

appeals.  (*Id.*).  Plaintiff also contends that Lt. Day retaliated against him for filing grievances by

writing a false disciplinary case against him.  (*Id.*).

Plaintiff's pleadings and attachments show that before June 23, 2005, plaintiff had

medical restrictions of no lifting more than thirty pounds, no squatting, no walking on wet or

6

uneven surfaces, and no medical assignment.  (Docket Entry No.14-3, page 7).  On June 23, 2005, PA Bouton added a four-hour work week restriction.[1]  (*Id.*, page 15).

Plaintiff's pleadings and attachments also show that on February, 2005, he was assigned to the outside utility squad as a field-force worker, which, according to TDCJ administrators, complied with his medical restrictions.  (Docket Entry No.15, page 6).  In mid-March 2005, plaintiff complained to medical personnel about the discomfort caused by state-issued boots, insoles, and arch supports; he also requested an appointment with an orthopedic surgeon and soft-soled shoes.  (Docket Entry No.14-2, pages 12-13).  He was informed that he had degenerative joint disease in his left knee.  In late March, he complained of chest pain and joint pain.  (*Id.*, pages 17-18).  He was given an EKG on March 31, 2005.  (*Id.*, page 19).

In early April, 2005, plaintiff requested testing for diabetes, cholesterol, and enzymes; he also complained of chest pain.  He was informed that his chest pain had been diagnosed as "musculoskeletal."  (*Id.*, page 18).  He complained again of constant chest pain and another appointment was scheduled.  (*Id.*, page 19).  In mid-April, plaintiff requested a "no extreme heat" restriction be added to his medical restrictions because of his blood pressure issues.  He also sought to have the uneven surface restriction modified to a "no wet or dry uneven surface" restriction because of his knees and ankles.  (*Id.*).  Such requests were denied.  (*Id.*).  Throughout April, 2008, plaintiff continued to submit sick call requests complaining of the same and seeking new medical restrictions.  (*Id.*, pages 20-26).

On April 11, 2005, plaintiff requested Classification Chief Dickerson to change his job assignment.  (Docket Entry No.14-2, page 15).  Dickerson responded that his office

---

[1] Plaintiff lists several more restrictions such as limited standing, no walking more than thirty yards, and no climbing that he claims were in place in 2005.  (Docket Entry No.26, pages 9-10).  Plaintiff's current HSM-18 reflects these medical restrictions.  (*Id.*, page 8).  Plaintiff's other attachments do not show that he was subject to these restrictions in 2005, but that restrictions were later added.  (*Id.*, page 11).

assigned jobs according to work restrictions and the utility squad number 3, to which plaintiff was assigned, was compliant with plaintiff's medical restrictions. (*Id*.). Dickerson told plaintiff to check with the medical department regarding his medical problems. (*Id*.). Plaintiff filed a grievance against Dickerson and Lt. Day, the field force supervisor, complaining of discrimination, negligence, and reckless endangerment because of his job assignment. (Docket Entry No.14, page 5). The grievance was denied. (*Id.*, page 6).

On April 28, 2005, plaintiff complained of headaches, dizziness, and blurred vision while working in the field and Lt. Day called another officer to take plaintiff to the infirmary. (Docket Entry No.26, page 12). Plaintiff claims that before he was transported to the infirmary, Day, who was mounted on his horse and pointing his service revolver toward plaintiff's lower body, approached plaintiff and said, "Kimble, if the infirmary don't do nothing forf [sic] you, I'm not sending your . . . ass in anymore, I ought to just put a bullet in your ass and take you out of your misery." (*Id*., page 13). Plaintiff claims that his blood pressure and pulse were found to be elevated. (*Id.*). Plaintiff determined that Day's statement was an indication that Day thought that nothing was wrong with plaintiff. (*Id*.).

On April 29, 2005. plaintiff was examined by Dr. Dumas, who addressed his complaints about chest pain. (*Id*., page 26). Plaintiff continued to complain of headaches, dizziness, and blurred vision, which he attributed to working in direct sunlight and extreme heat. (Docket Entries No.26, page 26, No.14-3, page 2). PA Bouton responded that Dr. Dumas had addressed the complaints. (Docket Entry No.26, page 26). On April 26, 2005, plaintiff was evaluated by a doctor for knee pain. (*Id*., page 27). Plaintiff was informed that x-rays showed degenerative changes and that a knee sleeve had been ordered. (Docket Entry No.14-3, page 2).

Plaintiff continued to file sick call requests seeking additional restrictions.  (*Id*., pages 3-4).  He was informed that no further restrictions were warranted.  (*Id*.).  Plaintiff then sought medical boots.  (*Id.*, page 5).  He was informed that he did not meet the criteria for medical boots.  (*Id*.).  He also sought knee surgery and was informed that he had been given a knee sleeve.  (*Id*.).  Plaintiff then complained to Nurse Smock that none of his issues had been resolved and that he was being treated differently than other inmates.  (*Id*., page 6).  PA Bouton replied that plaintiff received the same treatment as everyone else.  (*Id*.).  In response to another sick call request for knee surgery, Bouton told plaintiff that his knee did not require any surgery and that he had the appropriate restrictions.  (*Id*.).

On May 13, 2005, plaintiff filed a Request for Administrative Remedy with Warden Negbenebor.  (Docket Entry No.15, pages 4-5).  Plaintiff complained about Lt. Day's statement and indicated that he thought Day had discriminated against him because of his use of the grievance process.  (*Id.*, page 4).  Warden Seale responded that plaintiff had been seen by Dr. Dumas on April 29, 2005, and that Dumas indicated that plaintiff should continue his current medications, that no cardio referral was necessary, and that no further work restrictions were required at this time.  (*Id.*, page 5).

Plaintiff claims on May 19, 2005, Lt. Day again approached him on horseback while plaintiff was picking and sacking carrots.  (Docket Entry No.26, page 13).  Plaintiff contends that Day questioned him about the junior high school they attended, about some girls they knew, and about an altercation that had encountered.  (*Id*.).  Plaintiff claims that Day threatened, "[Y]ou had your time, its [sic] my time to do the f—king now, you belongs to me now."  (*Id.*).

Plaintiff claims that on May 24, 2005, he once again felt light-headed, dizzy, and faint and was taken to the infirmary. (*Id*., page 14). He claims that Lt. Day cursed him and then wrote a disciplinary case against plaintiff for being out of place. (*Id*., pages 14-15). The disciplinary committee determined that the wrong charge had been filed, so Day filed another disciplinary case against plaintiff for not completing his field force assignment. (*Id.*, page 15). Day told plaintiff that from now on, "I'm going to keep paper (disciplinary cases) in your . . . life." (*Id*., page 14). Plaintiff grieved the incident with Day and complained that Day had written a disciplinary case in retaliation but did not specify the motive for such retaliation. (Docket Entry No.14, pages 33-36). Plaintiff's grievances were denied. (*Id*.).

On June 13, 2005, Assistant Regional Director Guyton indicated in response to plaintiff's correspondence that plaintiff's assignment to the third shift utility squad complied with his medical restrictions. (Docket Entry No.15, page 7). Guyton stated that such assignment would keep plaintiff from direct sunlight, that the tools required for the job, *i.e*., a mop and broom, would not exceed ninety pounds, and that the hallways plaintiff would be required to mop would not be uneven, although they might be wet. (*Id.*). Guyton recommended that plaintiff sit on the floor or in a chair to complete tasks so that plaintiff would not have to mop. (*Id*.).

On June 23, 2005, plaintiff complained by grievance that Lt. Day refused to sign off on an incident report that plaintiff had injured his knee in the field. (Docket Entry No.14-2, pages 8-9). Warden Negbenedor found no evidence of wrong-doing and denied the grievance. (*Id*., page 9). Assistant Regional Director Guyton denied plaintiff's Step 2 grievance because there was insufficient evidence of misconduct. (*Id*., page 11). Plaintiff also wrote Warden

Negbenebor complaining of Lt. Day's behavior and mistreatment and requesting information on the status of the investigation.  (Docket Entry No.14-2, page 16).  In a response dated July 25, 2005, Negbenebor stated, "I have no evidence to indicate that Lt. Day did anything inappropriate."  (*Id.*).

In early July, 2005, plaintiff again sought the assistance of Chief Dickerson regarding his work assignment.  (Docket Entry No.14-3, page 15).  Dickerson indicated in his response dated July 5, 2005, that plaintiff had a new work restriction of a four-hour work day and that plaintiff would be worked within the new restriction of June 23, 2005.  (*Id.*).  Dickerson again indicated that the utility squad number 3 was compatible with plaintiff's medical restrictions.  (*Id.*).  A copy of plaintiff's request and Dickerson's response was sent to Lt. Day. (*Id.*).

On July 10, 2005, plaintiff filed a "Request for Administrative Remedy" with Warden K. Negbenebor.  (Docket Entry No.14, page 9).  Plaintiff again complained that he was being required to perform strenuous field work in spite of his medical health restrictions. Plaintiff claimed that he was assigned to the outside utility squad number.3, which was the same assignment as the hoe squad.  (*Id*.).  Plaintiff attached Guyton's correspondence to the Request and noted that he believed that Guyton was receiving the wrong information.   Warden Negbenebor responded on July 14, 2005, that "[n]o further action is indicated."  (*Id*.).

Apparently, plaintiff's job assignment was changed on July 18, 2005.  (Docket Entry No.15, page 6).  Plaintiff is currently assigned to the inside medical squad; he indicates that his present job requirements do not conflict with his medical restrictions.  (Docket Entry No.26, page 12).

### 1. Medical Care and Restrictions

Plaintiff claims that defendants Negbenebor, Seale, Dickerson, Day, Smock and Bouton, required him to perform strenuous work tasks that were beyond his physical capacity in spite of doctor's orders and that such tasks caused him to suffer pain and agony.  (Docket Entry No.26, page 2).

"[P]rison work requirements which compel inmates to perform physical labor which is beyond their strength, endangers their lives, or causes undue pain constitutes cruel and unusual punishment ." *Howard v. King,* 707 F.2d 215, 219 (5th Cir. 1983).  If a prison official knowingly assigns an inmate to a job he or she realizes may significantly aggravate a serious physical ailment, then such a decision would constitute deliberate indifference to serious medical needs that may violate the Eighth Amendment's prohibition against cruel and unusual punishment.  *Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989); *see also Calhoun v. Hargrove*, 312 F.3d 730, 734-35 (5th Cir. 2002) (finding claim that prison official purportedly knew about a four hour medical work restriction but forced inmate to work long hours, which raised blood pressure to dangerously high levels, was sufficient to survive a motion to dismiss). A negligent assignment to work that is beyond the prisoner's physical abilities, however, is not unconstitutional.  *Jackson*, 864 F.2d at 1246.  Moreover, a mere disagreement about a work assignment does not amount to deliberate indifference.  *See e.g. Douglas v. McCasland*, 194 Fed. Appx. 192 (5th Cir. 2006) (finding claim frivolous where plaintiff fails to show that defendants knowingly assigned him work that would significantly aggravate his medical condition); *Freeman v. Alford*, 48 F.3d 530 (5th Cir. 1995) (not designated for publication).   Moreover, to

succeed on a civil rights claim, plaintiff must show that his job assignment significantly aggravated a serious physical ailment. *Jackson*, 864 F.2d at 1246-47.

In this case, plaintiff's pleadings and attachments do not reflect that Dr. Dumas or any other physician issued an order specifically precluding plaintiff from performing a specific job assignment. Plaintiff's pleadings show that he suffers from degenerative bone disease in his knee and that from March, 2005 through June, 2005, he frequently complained of knee pain, which he attributed to working in the garden. His pleadings also show that he suffers from high blood pressure and that during the same time period, he often complained of headaches, dizziness, blurred vision, and chest pains, which he attributed to working in direct sunlight and extreme heat or to a reaction to medication from exposure to the same. Plaintiff's pleadings further show that medical personnel were often unable to substantiate the causes of plaintiff's complaints and did not necessarily agree that additional restrictions were required based on their evaluation of his medical issues.

Plaintiff's pleadings and attachments also show that initially, plaintiff was restricted to jobs that did not require heavy lifting, squatting, or walking on wet or uneven surfaces. Classification Chief Dickerson and other administrative personnel determined that plaintiff's assignment to the utility squad, which consisted of harvesting vegetables, cleaning fence lines, and flat-weeding, complied with these restrictions. (Docket Entry No.26, page 11). Dickerson was aware of plaintiff's restrictions, noting that the four-hour work restriction of June 23, 2005, would be enforced.

Plaintiff's pleadings and attachments, however, do not show that Dickerson or other administrative personnel knowingly assigned plaintiff to the utility squad with knowledge

that such job might significantly aggravate his knee problems or blood pressure or that they refused to re-assign him even after he voiced complaints of numerous ailments, especially in light of Dr. Dumas's notation that no additional restrictions were required.  Moreover, plaintiff's attachments do not show his assignment to the garden utility squad aggravated his degenerative knee, raised his blood pressure, or caused his headaches, chest pains, or other complaints given that medical personnel did not necessarily agree that such complaints were attributable to his working conditions.  Without more, plaintiff's claim that defendants were deliberately indifferent to his serious medical needs by assigning him to the outdoor utility squad is legally frivolous and subject to dismissal.

Plaintiff also alleges that PA Bouton and Nurse Smock ignored his complaints of pain and suffering (Docket Entry No.14, page 3) and "never arranged for the plaintiff [sic] need for physical therapy or other follow-up medical treatment" to alleviate his pain and never referred him to an orthopedic specialist. (Docket Entry No.26, pages 4, 6).  Plaintiff also alleges that his medical care was inadequate because sick call procedures did not permit adequate assessment of his medical needs and security staff overruled medical orders and interfered with treatment once prescribed.  (*Id.*).  Plaintiff  also claims that the medication that was provided was so cursory that it amounted to no care at all.  (*Id.*, page 6).

Plaintiff concedes that he was provided with over-the-counter pain medication for headaches, dizziness, and blurred vision.  (*Id.*, page 4).  He also concedes that he received treatment on April 28, 2005 for elevated blood pressure and a rapid pulse, but complains that he was given no physical therapy for his joint disease.  (*Id.*, page 6).  Plaintiff's sick call requests show that medical personnel, including PA Bouton and Nurse Smock, were responsive to his

complaints.[2]   They saw plaintiff in the clinic, scheduled appointments for him with other

---

[2] Plaintiff submitted sick call requests in mid-March 2005, complaining of discomfort caused by state issued boots, insoles, and arch supports, and requesting an appointment with an orthopedic surgeon and soft-soled shoes. (Docket Entry No.14-2, pages 12-13).  Smock responded that plaintiff had degenerative joint disease in his left knee and that a referral had been requested but there were no medical internists at that time.  (*Id.*, page 13).  Plaintiff even wrote to the director of the Braces and Limb Clinic, who advised him to get a referral.  (*Id.*, page 13-14).  Plaintiff sought such referral in a letter to Dr. Danny Adams.  (*Id.*, page 22).  In late March, he complained of chest pains and joint pain and Smock scheduled an appointment the next day.  (*Id.*, pages 17-18).  He was given an EKG on March 31, 2005.  (*Id.*, page 19).

In early April, 2005, plaintiff requested testing for diabetes, cholesterol, enzymes, and chest pains.  He was informed that his chest pain was diagnosed as musculoskeletal.  (*Id.*, page 18).  He complained again of constant chest pain and another appointment was scheduled.  (*Id.*, page 19).  In mid-April, plaintiff requested a "no extreme heat" restriction added to his medical restrictions because of his blood pressure issues.  He also sought to have the uneven surface restriction modified to a "no wet or dry uneven surface" restriction because of his knees and ankles.  (*Id.*).  Such request was denied.  (*Id.*).  Plaintiff filed another request complaining that his ankles hurt.  (*Id.*, page 20).  On April 20, 2005, plaintiff was seen by PA Smock.  (*Id.*).  He wrote to Administrator Hanna complaining that PA Bouton would not get his job changed even though plaintiff had medical restrictions of no squatting and no walking on wet uneven surfaces.  (*Id.*).  Plaintiff was told that he should discuss these issues with the Cluster Medical Director at his scheduled appointment.  (*Id.*, page 23).  Plaintiff also wrote Nurse Smock requesting an x-ray of his ankle, which Smock denied.  (*Id.*, page 22).  Plaintiff wrote Smock on April 22 complaining of the extreme heat and knee pain.  (*Id.*, page 24).  Smock scheduled an appointment on the 26th.  (*Id.*).  He wrote Smock on the 24th, requesting a new job assignment because of his blood pressure, chest pains, and dizziness.  (*Id.*, page 25).  He wrote Smock again on the 27th, complaining of headaches.  Smock indicated that plaintiff had an appointment with the Unit physician that day.  (*Id.*).  On April 29, 2005, plaintiff saw Dr. Dumas, who addressed his complaints.  (*Id.*, page 26).  Yet, plaintiff filed two sick call requests complaining of headaches, dizziness, and blurred vision.  (*Id.*).  PA Bouton responded that Dr. Dumas had addressed the complaints.  (*Id.*).

In early May, plaintiff noted that his knees had been x-rayed and inquired whether additional restrictions would be added because they were not getting any better.  (*Id.*, page 27).  He was informed that he was evaluated by a doctor on April 26, 2005 for knee pain and on April 29, 2005 for chest pain and no further restrictions would be added.  (*Id.*).  Plaintiff fired back that Dr. Dumas had seen him only for chest pain and not the headaches, dizziness, and vision problems and that he needed those conditions to be checked out.  (*Id.*, page 28).  Bouton noted that Dr. Dumas had written that no cardiac referral was necessary at this time.  (*Id.*).  Plaintiff also complained in another sick call request that he wanted to know the results of the x-ray of his knees and when surgery would be scheduled or a knee brace ordered or additional restrictions added.  (Docket Entry No.14-3, page 2).  Bouton responded that the x-rays showed degenerative changes and that a knee sleeve had been ordered.  (*Id.*).  In mid-May, plaintiff submitted another sick call request complaining of dizziness, vision problems and an appointment was scheduled.  (Docket Entry No.14-2, page 27).  Before the appointment, he filed another request complaining of the same and noting his belief that the symptoms were a reaction from the medication and his exposure to the elements.  (Docket Entry No.14-3, page 2).  After the appointment with Bouton, plaintiff filed several other sick call requests seeking additional restrictions.  (*Id.*, pages 3-4).  He was informed that no further restrictions were warranted.  (*Id.*).  Plaintiff then sought medical boots.  (*Id.*, page 5).  He was informed that he did not meet the criteria for medical boots.  (*Id.*).  He also sought knee surgery and was informed that he had been given a knee brace.  (*Id.*).  Plaintiff then complained to Nurse Smock that none of his issues had been resolved and that he was being treated differently than other inmates.  (*Id.*, page 6).  Bouton replied that plaintiff received the same treatment as everyone else.  (*Id.*).  In response to yet another sick call request for knee surgery, Bouton told plaintiff that his knee did not require any surgery and that he had the appropriate restrictions.  (*Id.*).  Plaintiff continued to complain of knee and ankle pain and his exposure to the heat and sun.  (*Id.*, page 7).  He was informed that he currently had restriction numbers 9, 11, 17, and 18.  (*Id.*).  In late May, pursuant to a sick call request, plaintiff was referred to a foot specialist.  (*Id.*).  In late May and early June, plaintiff complained of the inadequacy of the knee brace that had been issued.  (*Id.*, page 8).  Dr. Dumas told him to keep using it.  (*Id.*).  In response to another request regarding the knee brace, Bouton informed plaintiff that he had been issued a knee sleeve.  (*Id.*, page 9).  Plaintiff continued to complain of the

providers, and referred plaintiff to the Unit physician or other physicians. Their treatment of

plaintiff with respect to physical therapy or referral to a specialist was limited to the treatment

authorized by the Unit physician and other unit medical providers. Plaintiff's attachments also

show that his knee was x-rayed and that he saw doctor for his knee problems. (Docket Entry No.

14-3, page 2). In short, plaintiff's pleadings and attachments do not show that Smock and

Bouton were deliberately indifferent to plaintiff's medical needs; plaintiff's pleadings show

plaintiff's disagreement and dissatisfaction with his medical care. An inmate's disagreement

with his medical treatment is insufficient to show an Eighth Amendment violation. *Varnado v.*

*Lynaugh*, 920 F.2d 320, 321 (5th Cir.1991); *Norton v. Dimazana*, 122 F.3d 286, 291-92 (5th Cir.

1997) (holding an inmate's dissatisfaction with the medical treatment he receives does not mean

that he suffered deliberate indifference); *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979)

(finding "[m]ere negligence, neglect or medical malpractice is insufficient" to show Eighth

---

headaches, dizziness, and blurred visions. (*Id.*). Bouton replied that plaintiff's complaints had been addressed numerous times. (*Id.*). In mid-June, plaintiff complained that his knees and ankles hurt from the field work and that he continued to experience dizziness and so on from exposure to the sun and heat. He requested new medical restrictions. (*Id.*, page 10). Bouton responded that he would make no restriction changes because Dr. Dumas indicated that none were needed. (*Id.*). On June 20, plaintiff indicated that he reinjured his knee at work and an appointment was scheduled for June 23, 2005. (*Id.*, page 11). The next day, he asked if he had been scheduled for medical boots evaluation. (*Id.*). The response was that he did not meet the criteria. (*Id.*). In late June, plaintiff complained to Administrator Donoho that Unit medical staff had overridden Dr. Brooks' referral for a medical boot evaluation. (*Id.*, page 12). Donoho explained that Dr. Brooks' recommendation was treated as a specialty clinic note and that the medical provider determined what was best for the patient. (*Id.*). Plaintiff also appealed to Administrator Hanna, who indicated that he had been seen for these issues. (*Id.*). Plaintiff was informed on June 30, 2005, in response to a sick call request that PA Bouton had added restriction number 4 on June 23, 2005. (*Id.*, page 14). Bouton told plaintiff to talk to classification and offered to deliver plaintiff's prescribed pain medication to him. (*Id.*).

Plaintiff filed at least three sets of grievances complaining of Bouton's allegedly inadequate care. (Docket Entries No.14, pages 31-32, 37-38; No.14-2, pages 4-7). In one, he complained that Bouton, Dumas, and Smock had discriminated against him because they had not issued restrictions regarding extreme heat and exposure to sunlight but had done so for another inmate of Hispanic origin. (Docket Entry No.14, page 38). In response, Warden Negbenebor noted that no restrictions had been removed from plaintiff since 2002, and that his low row restriction had been renewed on May 11, 2005, per his sick call request. (*Id.*). Negbenebor further noted that Dr. Dumas had examined plaintiff on April 29, 2005 and determined that no further work restrictions were medically necessary. (*Id.*). The responses to plaintiff's other grievances were similar. (Docket Entries No.14, page 32; No.14-2, page 5).

Amendment violation).   Accordingly, plaintiff's complaints against Bouton and Smock are subject to dismissal.

Plaintiff further alleges that he "was denied medical care because defendant Thomas Day believe[d] plaintiff was faking and charged plaintiff with misbehavior reports." (Docket Entry No.26, pages 4, 7, 14-15).  Plaintiff does not claim that Day refused to allow him to go to the infirmary when he complained of physical ailments or that plaintiff did not go to the infirmary when necessary because he feared a disciplinary report.  Plaintiff's claim that Day denied him medical treatment is legally frivolous and therefore, subject to dismissal.

### 2. Retaliation

Plaintiff maintains that Lt. Day filed a fraudulent disciplinary case against him, because plaintiff filed grievances against TDCJ officials.  (Docket Entry No.26, pages 13-14). Plaintiff alleges that Day charged plaintiff with being out of place and later changed the charge to "not completing his field force assignment" even though plaintiff had been taken to the infirmary for medical reasons.  (*Id.*, page 15).  Plaintiff claims that Day's threats and derogatory remarks show that Day was retaliating against plaintiff by filing false reports.

To state a valid claim for retaliation under section 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.  *McDonald v. Stewart*, 132 F.3d 225, 231 (5th Cir. 1998); *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999). For example, officials may not retaliate against an inmate for using the grievance system.  *Jackson*, 864 F.2d at 1249.  A plaintiff must allege facts showing that a defendant possessed a retaliatory motive.  *See Whittington v. Lynaugh*, 842 F.2d 818, 820 (5th Cir. 1988); *Hilliard v. Board of*

*Pardons and Paroles*, 759 F.2d 1190, 1193 (5th Cir. 1985).  He must allege more than his personal belief that he was the victim of retaliation.  *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997); *Jones*, 188 F.3d at 324-25.  Mere conclusory allegations of retaliation are not enough.  *Moody v. Baker*, 857 F.2d 256, 258 (5th Cir. 1988).  Moreover, he must show that "but for" a retaliatory motive, the defendants would not have engaged in the action.  *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).

Plaintiff states no facts to show that Lt. Day was aware of any grievance that plaintiff might have filed against him or any other TDCJ official.  Day's crude language and veiled threats, which plaintiff construed to mean that Day believed that plaintiff was faking his ailments and Day was going to file disciplinary charges against plaintiff, do not show a motive or intent to retaliate.  Plaintiff's retaliation allegation is conclusory and therefore, does not provide a basis for a potentially successful civil rights lawsuit.  Accordingly, such claim is subject to dismissal.

### 3. Discrimination

To the extent that plaintiff alleges that defendants discriminated against him in any way, he fails to state any facts that would give rise to such claim.  To show a violation of his equal rights, plaintiff must show purposeful discrimination resulting in a discriminatory effect among persons similarly situated.  *Muhammed v. Lynaugh*, 966 F.2d 901, 903 (5th Cir. 1992).  In this case, plaintiff has not shown a violation of his equal protection rights because he has not shown that he was similarly situated to any inmate who suffered the same disabilities and medical conditions and has not shown any purposeful discrimination.  His claim is conclusory and therefore, subject to dismissal.

4. Personal Involvement

Plaintiff complains that Wardens Negbenebor and Seale were responsible for the actions of defendants Smock, Bouton, Dickerson, and Day because they failed to correct the medical restriction violations of these subordinates.  (Docket Entry No.26, page 10).  Plaintiff's pleadings and attachments do not show that Wardens Negbenebor or Seale were personally involved in plaintiff's medical care, job assignment, or disciplinary actions, except to the extent that they responded to plaintiff's grievances and correspondence.  *See Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (liability based on supervisory capacity exists only if supervisor is personally involved in constitutional deprivation or a sufficient causal connection exits between the supervisor's wrongful conduct and the constitutional violation).  An inmate does not have a constitutionally protected liberty interest in having grievances or complaints resolved to his satisfaction.  *See Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005).  Accordingly, plaintiff's claims against Wardens Negbenebor and Seale are legally frivolous and subject to dismissal.

IV. CONCLUSION

Based on the foregoing, the Court ORDERS that plaintiff's complaint is DISMISSED, with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B).  All claims against all defendants are DISMISSED with prejudice.  All other pending motions are DENIED.

The Clerk will provide a copy of this order by facsimile transmission, regular mail, or e-mail to the TDCJ - Office of the General Counsel, Capitol Station, P.O. Box 13084, Austin, Texas, 78711, Fax: 512-936-2159; the Inmate Trust Fund, P.O. Box 629, Huntsville,

Texas 77342-0629, Fax: 936-437-4793; and the District Clerk for the Eastern District of Texas,

211 West Ferguson, Tyler, Texas  75702, Attention: Manager of the Three-strikes List.

      SIGNED at Houston, Texas, this 25th day of September, 2008.

                                        MELINDA HARMON
                                 UNITED STATES DISTRICT JUDGE